Mr. Mazzoli, on behalf of the appellant, I have reserved 5 minutes for rebuttal. This case is exactly why the Warren Act's unperceived business circumstances exception exists. On June 25, 2009, the marshals of the FDA showed up at Caraco's facility and seized all of its products, causing it to have to lay off most of its employees. The FDA's action was sudden, unexpected, dramatic, and outside of Caraco's control. Exactly what the regulations say needs to happen for this exception to apply. It was also the type of enforcement action that the FDA almost never took. A fact that was demonstrated by the statistical evidence that Caraco submitted showing that the FDA engaged in very few seizure actions, especially relative to the number of warning letters that they issued. But the district court, unfortunately, did not even address those statistics. A similarly situated employer would not have known, as of April 27, 2009, the date that the Warren Act was passed. No, the fact that there are only a few enforcement actions of this type really doesn't tell you anything about whether others against whom such action was not taken are similarly situated. I mean, they could be people with no problems, matter problems. I mean, your client had a long history of very serious problems and had been warned of the possibility, perhaps even the likelihood, of such an action by two independent consultants. So we don't know anything about the circumstances of those other drug companies. That's true. We don't. But we still know that the FDA only engages in relatively few seizure actions. I think six, eight, and eight in the three years that we provided. And that certainly is at least some indication that that action, under any circumstances, is one that the FDA rarely engages in. Well, is that evidence that they rarely engage in it? Or is that evidence when somebody else gets a warning letter, they immediately take it up and fix the problem? That's correct. It could be evidence of that also. I was searching the record for anything else that you used to create the comparator, and that's the only information I find, is it? That is the only information. That's it. That was the information that we had was that statistical evidence. But it's your burden, correct? Correct. It was our burden. But that was just only one part of the overall picture. I mean, there was also the experience and history that the individuals involved in this case had of never having had that kind of experience. Mr. Kerkowitz, who'd been there for several decades and had never experienced that. But that's just one piece of the puzzle. In addition, though, what we had to demonstrate is that not only was it not foreseeable as far as whether or not they were going to engage in an enforcement action, but also the nature and timing of the enforcement action. All that was uncertain to us, and there was nothing in there to really give us any kind of guideposts. At the point in time in April of 2009, a similarly situated employer would not necessarily have known the timing, even if it knew that an enforcement action was coming. There was nothing to give it any indication that it was going to be 60 days later after April, and there was nothing to give it any indication of the nature of that. In fact, even the company's own experts weren't in agreement on the nature of the enforcement action. Quintiles was telling the company that back in July of 2008, well, what's going to happen, what's likely is you're going to have a targeted or conceivably a mass seizure. But that didn't happen. It didn't happen immediately after that. In November, you've got the other consultant, Kendall, another expert, saying, well, you're at risk of an enforcement action, and we think it will be a civil action. And so it's unclear to the experts, and if it's unclear to them, it's certainly unclear to the company, as to what nature that enforcement action could take. And that's important because a different type of enforcement action would not have led to a Warnack situation. A targeted seizure of one or two products wouldn't have forced the company to shut down. A civil injunction may not have forced the company to shut down. And conceivably, the FDA could have issued another warning letter, and that wouldn't have caused the company to shut down. Yeah, I get the sense from the record, really, as Judge Gibbons had mentioned, that it seems that by the last quarter of 2008 and that first half of 2009, this is a little bit like that Pena case from the Seventh Circuit back in 2004, that the problems at the company had really escalated. There had been this long history of these 483, you know, citations and some warning letters. But starting early 2009 or so, you had a lot more recalls of drugs, a lot more problems. Kendall had gone and then performed this audit and had identified all kinds of critical problems. And it just seemed that, you know, we had a bench trial here, right? I mean, so we've got findings of fact that we have to review under the clear error standard, that when one looks at reasonable foreseeability, that the trial judge here found that that last six or nine months, things had gotten so critical that Mr. Movins and others really should have foreseen that, you know, the company, there might be this mass seizure. And I realize there had been this nine or so year history of back and forth and the company trying to respond, but things had just really gotten critical. So I don't know how you would respond to that. But I guess I'm saying that really a CEO would have foreseen, as of April, as of May, as of June, that some sort of a mass seizure likely would have occurred. But, Your Honor, there, that last part of your question has really touched upon the problem facing Carrico, is that even if it knew that it was foreseeable that an enforcement action was probable, again, the timing was uncertain. And what the other cases like Roquet have shown, that if the timing is uncertain, you still don't have then an obligation to issue the warn notice. And as you said, it could have been April, it could have been May, it could have been June. The timing is only uncertain in that it could happen any day, right? I mean, you don't know what day it might occur, but you know that you're at a point where it could happen at any point. Well, number one, the timing of an enforcement action could be any day. But, again, you don't know what the nature of that enforcement action could be. And depending on the nature, that won't necessarily cause you to have to shut down. Yeah, but you've been warned about the probability of mass seizure and shutdown and that sort of stuff. Correct. And also we're told by the same consultant that it could be a targeted seizure, which wouldn't have caused us to shut down, and told by the other consultant that it could be a civil injunction, which also wouldn't have caused us to shut down. But, again, the timing issue is one of the critical things. I mean, the district court said, well, at any moment in that 14-month period, it was highly probable. But if CARICO had issued it at any time before that April time frame, it would have been premature, and you would be harming the very same employees you're trying to help. But you don't have to. A notice that you may be laid off does not make a layoff requisite. Correct? Right. This is about a notice. This is just about warning the employees. So I'm not sure why you think that would harm the employees, because they don't have to be laid off. Well, but as the Allison-Orr case and others have pointed out, number one, the Department of Labor discourages that kind of rolling notice. And number two, it does have a detrimental effect on the company. I mean, once you issue out that notice, even if you say, well, we're not sure, we think it might happen, now you've got creditors that might start getting nervous and might start pulling the plug on funding. You've got employees who are going to say, well, if this is a possibility, I'm out of here, and it's a practical matter. But I'm struggling here with the fact that in February of 2009, you thought it was important enough to put it in an SEC filing and give notice to your shareholders, but you didn't provide notice to your employees. I don't understand something that's serious enough to report to shareholders, and yet you think doesn't qualify for the same sort of information directly to your own employees. Well, Your Honor, the notice that was put in there was just the repeating of the warning letter. And the warning letter which included the possibility of seizure and injunction. So it's not like it's a hidden issue. You can't say, well, the public doesn't know what's going on, so I better not tell the employees, because you've already given that notice through your SEC filings to your shareholders. Right, but it's not a hidden issue to the shareholders or the employees. And so the information is out there. But to take it the next step and actually issue the warn notice, I think that takes it to a whole other level, because there you're saying you're actually talking about a shutdown as opposed to the language in the warning letter, which just talks about the possibility of additional enforcement action, which could take different types of forms, which won't necessarily cause the company to shut down. I see that I'm up. You'll have your full rebuttal time, Mr. Hoffman. Thank you. Good morning, Your Honors. Alan Posner appearing on behalf of the Callaway class. Judge Cole, you summarized the first part of my argument pretty well. The district court decided this fact question, that is, whether it was reasonably foreseeable to a company like Carrico, based on all of the evidence that had accumulated by April of 2009, that the FDA would take enforcement action, at least as a probability. This court, of course, has a clearly erroneous standard of review as to that finding, and it is very clear that we know that on April 17, Carrico's own consultant, Kendall, warned them that the FDA has now completed their most recent investigation. The corrections haven't been made. We're finding a number of things. They'll probably even find more. And the CEO admitted in his testimony at trial that the only path to avoiding an enforcement action was to correct the violations, and that if the corrections were not made, it was reasonably foreseeable that there would be action. And since the violations were broad-based, it was likely that the action would be broad-based. In fact, they recalled really all of their products. I said 29, but the testimony was from Mr. Movins. Specifically, he said, we recalled all of the products voluntarily. So the defense in their reply brief said, well, you know, FDA supposedly told consumers they could keep taking the medications, but all the medications have been recalled, so there's really no corroboration that the FDA even said that. But their violations went right across the board. If we look at some of their exhibits on the 2008 FDA 483, the production department, quality control, product finishing, packaging, raw material dispensing, record keeping on training and inventory and cleaning, preventative maintenance, they were all cited. So broad-based violations is going to present a reasonable foreseeable likelihood that there will be broad-based relief demanded by the FDA. I mean, you know, I guess, you know, but the company and the FDA have been having these sort of interactions for, you know, close to 10 years, and there was a warning letter back in, I think, 2000, and it went back and forth, and CARICO is trying to correct things, and it seems like the FDA said that things are getting a little bit better, and there was no reason to issue a warning letter during that period, apparently. So I guess, you know, what was different in 2008 in terms of the warning letter from the one back in 2000? I mean, CARICO says we're just continuing to try to make things better. One warning letter was on a single product, not GMP violations. The second warning letter, we see no 483 for the next two years after that, thereby implying that, indeed, as Judge Stranch mentioned, it looked like they cleaned up their act for a while. Then Muvins comes on board, and he wants to expand the company. In fact, he says we're expanding exponentially in a press release, I think. The FDA is finding more and more violations, repeat violations, and now they're finding inconsistent explanations that CARICO has given, thereby calling their credibility now into serious question. So now this warning letter in October is issued, and they say in December, look, you've got a problem with tablet size here. These are not esoteric, you know, technical violations. You open up a pill bottle, and the tablets are different sizes. Okay, so that's in December. You've got to fix your tablet sizes. We will assess your compliance at the next inspection. They come in two months earlier than usual for the next inspection. Their own consultant, Kendall, is there with them. And, again, on April 17, Kendall is telling them, look, you've got a lot of violations here in spite of the warning letter, and Muvins and Kirkowitz of VP Equality have both admitted in their testimony that the only path to avoid FDA enforcement action at that point was to correct those violations. So that's how we get to reasonable foreseeability. Now, in terms of defense wants to say, well, it was uncertain exactly when this would happen. And, Judge Cole, I think your explanation or your response to that was right on point. At that point, it could happen any day. Now, if on April 18 FDA comes in and shuts them down and they gave notice on April 17, well, then they're excused for 59 days because at that point, you know, it was sudden. But FDA waited more than 60 days. After April 17, when Careco gets its notice from its own consultant, it still has nine more days to consider the issue, what's likely here, at least what's reasonably foreseeable here as the standard. And we know it took them 10 days, including the July 4th holiday, to conclude that once they did do a seizure, we're going to have to shut down and issue the warrant notices. So I'm giving them the nine days. I'm going from April 17 to April 26. That's when the warrant notice should have gone out, and it can be a provisional notice. The regulations encourage that. If this following event occurs, then, you know, you're on notice that you are likely to be laid off. In fact, the regulations encourage warrant notices. They don't encourage rolling notices, but nobody is suggesting that. And the probability, or at least the foreseeability, of action by the FDA increased immeasurably once Careco failed to correct the violations following the 2008 warning letter. It's not a situation where, you know, for 14 months they were in dire jeopardy, and so how could we possibly do anything except issue rolling warning notices or the cry wolf defense that since FDA hadn't done it earlier, they're never going to do it. I mean, these are, you know, by the time they're recalling all their products, we know that, you know, there's a health danger to the public. I mean, how much longer is FDA, you know, going to sit by and do nothing? The CFR regulation that applies here, 639.9b.1, says, a government-ordered closing of an employment site that occurs without prior notice may also be an unforeseeable business circumstance. Here we have all kinds of notices, warnings. Judge Stranch, I think your point was a very good one. Careco is giving notice not only to shareholders but prospective shareholders who have very little interest in the company compared with the people who are relying on that company to put food on their table for their families. One gets the notice, the other one doesn't. There was also a press release, so the public is out there. In terms of the sudden, dramatic, unexpected, there was nothing sudden about this action. The FDA was very deliberate. They took lots of time. They gave them a number of chances, but finally a warning letter and finally action after failing to correct. It was not unexpected under those circumstances. I think a reasonable CEO, a reasonable drug company in similar circumstances would know that it's reasonably foreseeable. Certainly one is not left with a definite and firm conviction that the trial court made a mistake in that fact finding. Dramatic, I suppose there's always some drama when the feds come in and shut you down, but sudden, unexpected, and dramatic, at most they have perhaps half of one out of three. I finished a little early. If you have any questions, I'd be happy to take them. Apparently not. Thank you. Okay. Thank you. Thank you. First, with respect to the standard review, I think what we have here is actually a mixed question of fact and law, as the cases that we cited too that have reviewed this issue as to whether this exception applies. It is a mixed question of fact and law. And so we have a de novo review, especially when most of the facts at issue in this case are largely undisputed in here. In fact, both parties filed motions for summary. As far as it being broad-based allegations and should have put us on notice that it was a broad-based possible enforcement action, well, again, the experts weren't in agreement with that and weren't telling us different things besides. They were in agreement that there was likely an enforcement action. Your position is that they varied as to how quickly and how hard the response would be. Exactly. And that's critical because if you don't know when it's coming, then the WARN Act obligation is not triggered. Isn't that a difficult argument to make because the outcome of that is really I don't know when I have to tell my employees something until they come in and tell me they're doing it. I'm struggling with the specificity you're requiring, in light particularly of 10 years of notice, but just the specificity when you are being told over and over there's going to be an enforcement action and we're going to do it quickly and you're in a broad-based problem. I guess I would say do you expect that you have to have the letter from the FDA that says we're coming in tomorrow? I think you have to have something more than what we have here, some indication that the next stop, that's it. But if you look at the Roque case, for example, the Department of Justice told them we are going to indict them. What about PINA? In PINA, though, it's not a helpful case. I don't want to argue that. But I think there are distinctions there. There the company was not spending much money, had canceled plans to fix some sort of cooler, and most importantly the court found there that the USDA had issued new regulations that should have put the company on notice that this type of action was more likely to occur. That didn't happen in this case. And also in this case we had done everything our experts had told us and the quintiles, for example, had said, we've seen companies avoid enforcement action by doing essentially Didn't one of your consultants told you not to undertake new product development because you felt that that would be a problem with the administrators and wasn't there then a public announcement that you were moving right into new product development? Correct. But in that public announcement we specified that really where that product development was coming from was just the products that we were getting from Sun Pharma and then just reselling it, not anything that we were developing or anything we're actually manufacturing there in the facility. And that's what the unrebutted testimony of Mr. Mulvins was, is that all those products, most of those new products, were really coming from the parent company who was just giving them to us and we're relabeling them and shipping them out. So it's really not touching upon the issues that were of concern to the As far as the notices go, I think the regulations are clear. They do not support a rolling notice. And if we take what the district court said, that it could have happened at any moment over 14 months, then I don't know how a company avoids a rolling notice. I mean, if that's what gets affirmed in this court, the precedent is going to be, well, if you've got a situation where it could happen at any time and it extends on for 14 months, then you're going to have to issue those kind of rolling notices to avoid liability. That or you're going to have to shut down, neither of which I think is an optimal situation. And, again, if we had issued a warrant notice and shut down at any point earlier in that 14-month period, it would have been premature and harmed those employees. And if we had been just issuing notices at all the time, again, I think that would have been harmful to the employees and to the company, and contrary to what the Department of Labor would have us do. Do you have any other questions? Apparently not. All right. Thank you very much. Thank you, Mr. Mazzoli and Mr. Posner. This case will be submitted.